**Opinion issued January 13, 2026.**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-25-00592-CV

———————————

## IN THE INTEREST OF N.P.G., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-01782J**

---

### MEMORANDUM OPINION

In this accelerated appeal, Mother challenges the trial court's order terminating her parental rights to her child, N.P.G.[1] Mother argues on appeal that the evidence is legally and factually insufficient to support: (1) the trial court's termination of her parental rights under Texas Family Code subsections

---

[1] We refer to the parties using the pseudonyms adopted by the parties. *See* TEX. R. APP. P. 9.8(b)(2).

161.001(b)(1)(E) (engaging in conduct or knowingly placing child with persons who engaged in conduct that endangers child's physical or emotional well-being), (N) (constructively abandoning child who has been in managing conservatorship of Department of Family and Protective Services (the Department) for not less than six months), and (O) (failing to comply with provisions of court order establishing necessary actions for parent to obtain child's return); and (2) the trial court's termination of her parental rights under subsection 161.001(b)(2) (termination in child's best interest). We affirm.

## Background

This appeal concerns N.P.G., a child who was under the age of one year old at the time of trial.

### A.    N.P.G.'s Mother and Father

The Department caseworker assigned to the case testified at the June 18, 2025 trial that Mother has a long history of drug use that resulted in the termination of her rights as to at least five of her other children. Mother has struggled with housing instability and homelessness. Department records introduced as an exhibit at trial show multiple allegations against Mother of abuse and neglect of children in her care. Some of those allegations were ruled out or unable to be verified, but the Department had reason to believe that some accusations against Mother of

2

"neglectful supervision" due to drug use were accurate. Mother has a criminal conviction for assault causing bodily injury.

Mother's parental rights as to five children under the age of 13 were terminated in 2019 under Texas Family Code subsections 161.001(b)(1)(D) (knowingly placed or allowed children to remain in conditions or surroundings that endangered children's physical or emotional wellbeing), (E) (engaging in conduct or knowingly placing children with persons who engaged in conduct that endangered child's physical or emotional well-being), and (O) (failing to comply with provisions of court order establishing necessary actions for parent to obtain children's return).

The caseworker testified that Mother believed that N.P.G.'s father could be either Potential Father 1, whom Mother referred to as her husband, or Potential Father 2. Mother provided no contact information for Potential Father 2, and the caseworker was unable to locate him. Potential Father 1 told the caseworker that he was not N.P.G.'s father, was unwilling to do a DNA test, and was unwilling to "be involved." Potential Father 1 has a criminal history that includes convictions for arson and assaults of family members and charges of driving while intoxicated, possession of a controlled substance, and making a terrorist threat.

**B.     N.P.G.'s Removal**

The caseworker testified that Mother did not test positive for drugs at the time of N.P.G.'s birth. N.P.G. came into the Department's care because Mother tested positive for cocaine and amphetamines at a prenatal visit in April 2024. The Department requested temporary managing conservatorship of N.P.G. based on "the danger to the vulnerable newborn . . . from the mother's pattern of illegal drug use and dangerous [unhoused] living environment described by the mother as having 'drugs everywhere,'" along with "the extensive [Texas Child Protective Services (CPS)] history of the mother, which includes illegal drug use and prior terminations, and the criminal history of the alleged father, which includes two convictions for domestic [violence]."

The caseworker testified at trial that she did not know where all of N.P.G.'s siblings were living, but that a family member had adopted some of them and was unwilling to take N.P.G. According to Department records introduced at trial: (1) "[r]easonable efforts were made to prevent the removal of the baby by contacting numerous relative and foster parents to the parents' older children, but nobody was willing and/or able to take the baby due to various circumstances, including fear of repercussion from the alleged father"; and (2) Mother "declined to allow [N.P.G.] to reside with a family member if they did not allow her to reside in the home as well."

The Department's investigation at the time of the removal showed that:

- Mother stated that she had not used any type of illegal substance since December 2023, and the only reason she tested positive for cocaine and amphetamines at her prenatal visit was because she was living on the streets at the time, where there are "drugs everywhere" and she could have touched something with drugs on them. Mother stated that a family cousin was going to allow Mother and N.P.G. to live in her home. Mother sought to have that cousin be a safety monitor for Mother and N.P.G., and expressed her own strong desire to "turn her life around and do better."

- The family cousin confirmed that she was willing to have Mother and N.P.G. live with her, and to be a safety monitor for Mother and N.P.G. However, the Department concluded that the cousin was not an appropriate safety monitor because the cousin had a "concerning CPS history" that included allegations of drug use.

- Mother then proposed a friend as a safety monitor. When Mother was informed that Mother, N.P.G., and the friend would have to live together, Mother stated that they could live with the family cousin whom the Department had rejected as a safety monitor.

- A relative of N.P.G. stated that she was unable to take N.P.G. given her personal circumstances, and warned that "everyone is going to be scared" to take N.P.G. due to Potential Father 1 "being crazy." The relative stated that Potential Father 1 had been in jail for arson and assault of a family member. The relative suggested another relative as a potential caregiver for N.P.G., but that other relative declined to take N.P.G. due to concerns about harassment from N.P.G.'s parents.

- Another relative stated that Mother was a "dangerous person," and that she was afraid of both Mother and Potential Father 1. The relative stated that her fear of the couple, whom she accused of various illegal acts including abandoning a "dirty and unfed" child with a disabled relative, prevented her from taking custody of N.P.G.

- The foster parent of one of N.P.G.'s siblings stated that she did not know if she would be able to take N.P.G. given her commitments at the time. The foster parent of another of N.P.G.'s siblings stated that he was unable to care

for N.P.G. The Department attempted but was unable to speak with three other foster parents of one or more of N.P.G.'s siblings.

- The Department attempted but was unable to speak with Potential Father 1 or N.P.G.'s maternal grandparents.

In July 2024, a court appointed the Department as N.P.G.'s Emergency Temporary Sole Managing Conservator.

In October 2024, the Department reviewed a possible placement for N.P.G. that was based on a suggestion by Mother. The suggested couple appears to have been rejected because the wife could not show proof of her income and the husband, whom the wife said was working toward obtaining citizenship in the United States, did not submit to a requested background check.

In December 2024, the Department reported that Mother had "attended hearings and conferences and visitations" but that, since the Department's prior report, Mother had been late to two visits with N.P.G. and missed one.[2] The Department noted that Mother's visits with N.P.G. were "going well," that Mother

---

[2] This evidence, which is in the record but was not admitted at trial, conflicts with trial testimony by the Department caseworker that, after N.P.G.'s removal from her care, Mother attended one visitation with N.P.G., on November 22, 2024—and that neither Mother nor anyone else contacted the caseworker to schedule any other visits. For the reasons discussed below, including our obligation to consider all evidence in the light most favorable to the trial court's finding, we do not need to resolve that inconsistency. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (noting that, when performing legal sufficiency review when burden of proof is clear and convincing evidence, court should look at all evidence in light most favorable to trial court's finding to determine whether reasonable trier of fact could have formed firm belief or conviction that its finding was true).

had shown compassion and ability to care for N.P.G., and had not been distracted by her phone or other devices.

## C.    Pretrial Hearings

Mother attended at least four pretrial hearings prior to the June 18, 2025 trial: two in August 2024, one in September 2024, and one on May 7, 2025. Based on the September 2024 hearing, the trial court approved a plan permitting Mother to visit N.P.G.

At the June 18, 2025 trial, Mother's counsel stated that she had not communicated with Mother since the May hearing. At the May hearing, the trial court had admonished Mother to file a statement of indigence, but none was filed. The trial court noted at trial that, without that statement, the trial court saw no basis for Mother's having a court-appointed attorney.

## D.    Mother's Circumstances at Time of Trial

Mother did not attend the June 18, 2025 trial. The caseworker testified at trial that, after Mother stopped communicating with the Department, the caseworker received word that Mother had started using drugs again, was unhoused, and was living behind a shopping center. The caseworker found Mother at that location in May 2025 but did not speak to her for safety reasons. Mother appeared to be under the influence, looked unhealthy, was wearing dirty clothes,

and had dirty hair. Mother was with approximately four other people whose appearance was similar to Mother's.

**E.    N.P.G.'s Circumstances at Time of Trial**

At the time of trial, N.P.G. was living with a foster mother and father who offered N.P.G. a potential adoptive home. The caseworker testified that the foster parents were a good fit for N.P.G. and were taking very good care of her. N.P.G. had bonded with her foster parents, and her foster parents had bonded with her. The only family N.P.G. had ever known was her foster parents. The foster parents had a three-bedroom home and a support system that included significant assistance from the foster father's father, who lived in the same neighborhood, and the foster mother's sister.

The caseworker testified that, at the time of trial, N.P.G. was doing "really well" and meeting all her milestones. N.P.G. had no physical issues. N.P.G. was developmentally on target. N.P.G. had an Early Childhood Intervention assessment and was found to not require any services. N.P.G. was eating well, and doing well on a strict schedule.

**F.    Trial Court Judgment**

At the June 18, 2025 trial, the trial court terminated Mother's parental rights under Texas Family Code subsections 161.001(b)(1)(E), (N), and (O), and that the termination of Mother's parental rights was in N.P.G.'s best interests under

subsection 161.001(b)(2). The trial court appointed the Department as N.P.G.'s Permanent Managing Conservator.

## Sufficiency of the Evidence

### A.     Standard of Review

In a case to terminate parental rights under section 161.001 of the Texas Family Code, the Department must establish that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements—i.e., both the statutorily prescribed predicate finding(s) and that termination is in the child's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When assessing the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the record in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have

formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (discussing elevated standard of review in parental termination cases). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. When "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id.* In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* The evidence is factually insufficient if, considering the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *See id.* at 109.

**B. Applicable Law**

Protection of the best interest of the child is the primary focus of a termination proceeding. *See A.V.*, 113 S.W.3d at 361. However, a parent's rights to

the "companionship, care, custody, and management" of a child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) (citation modified); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20-21 (Tex. 1985).

Here, the trial court terminated Mother's rights under subsections 161.001(b)(1)(E), (N), and (O). The Texas Supreme Court has held that, because subsection (M) provides a basis to terminate parental rights due to a prior subsection (D) or (E) finding, due process concerns coupled with the requirement for a meaningful appeal require that, if an appellate court affirms a termination order based on a (D) or (E) finding, the court must provide the details of its analysis. *See In re N.G.*, 577 S.W.3d 230, 236-37 (Tex. 2019). Because Mother challenges the trial court's findings under subsection (E), thus implicating due process concerns, we start our sufficiency of the evidence analysis with that subsection. *See id.*; *In re Z.M.M.*, 577 S.W.3d 541, 542-43 (Tex. 2019) (per curiam).

## C.    Predicate Findings Under Subsection 161.001(b)(1)(E)

In Mother's first through third issues, she challenges the sufficiency of the evidence to support the trial court's termination of her parental rights under,

respectively, subsections (E), (N), and (O) of section 161.001(b)(1) of the Family Code. Subsection 161.001(b)(1)(E) of the Family Code focuses on the parent's conduct and asks whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Under subsection (E), courts may consider conduct both before and after the Department removed the child from the home. *In re J.A.R.*, 696 S.W.3d 245, 254 (Tex. App.—Houston [14th Dist.] 2024, pet. denied); *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer any injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (mem. op.). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional

well-being. *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.). The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *See In re M.A.J.*, 612 S.W.3d 398, 407 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). Under subsection (E), the evidence must show that the endangerment was the result of the parent's conduct, including acts, omissions, or a failure to act. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Department records show that Mother has a criminal conviction for assault causing bodily injury.[3] "Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children." *In re J.B.M.*, No. 04-18-00717-CV, 2019 WL 1139858, at *2 (Tex. App.—San Antonio Mar. 13, 2019, pet. denied) (mem. op.).

---

[3] Mother complains on appeal that "the only evidence of this old misdemeanor offense is one line of hearsay in the caseworker's court report. A judgment of conviction was not offered into evidence." Mother's conviction was referenced in the Department's Exhibit 1 at trial, an affidavit made on the basis of personal knowledge that was admitted without objection by Mother's counsel and is thus probative evidence. *See Tex. Com. Bank, Nat. Ass'n v. New*, 3 S.W.3d 515, 516 (Tex. 1999) (noting that unobjected-to hearsay in affidavit is probative evidence); *J.B. v. Tex. Dep't of Fam. & Protective Services*, No. 03-24-00159-CV, 2024 WL 3906786, at *1 n.3 (Tex. App.—Austin Aug. 23, 2024, no pet.) (mem. op.) (in parental termination case, holding that appellant's failure to object to admission of affidavit at trial waived any hearsay complaint on appeal). Moreover, as shown, Mother's assault conviction is merely cumulative evidence of endangerment.

Mother has also struggled with illegal drug use. The Supreme Court of Texas has clarified that, "[w]hile illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (emphasis in original). Drug-use evidence should not be evaluated in isolation; rather, it should be considered alongside evidence showing that "illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* (quoting *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)); *see also A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (characterizing *R.R.A.* standard as "holistic endangerment review").

The supreme court has since affirmed a termination order based on evidence that the parents used drugs together while the mother was pregnant and while caring for the child's half-sibling; visited the child only sporadically after the child was born; and did not comply with a court order that they refrain from using drugs and submit to drug testing. *A.V.*, 697 S.W.3d at 659. The supreme court held that such conduct "show[s] a pattern of continued substantial risk of harm to the child sufficient to support a trial court's finding of endangerment." *Id.*; *see also In re Z.J.G.*, No. 01-24-00894-CV, 2025 WL 1129130, at *10 (Tex. App.—Houston [1st Dist.] Apr. 17, 2025, pet. denied) (mem. op.) (after *R.R.A.*, affirming termination order based in part on evidence parent used drugs during termination proceeding);

14

*In re J.C.P.L., Jr.*, No. 01-24-00723-CV, 2025 WL 757159, at *6 (Tex. App.—Houston [1st Dist.] Mar. 11, 2025, pet. denied) (mem. op.) (same); *In re A.R.D.*, 694 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) (after *R.R.A.*, affirming termination order based in part on evidence of parent's drug use while pregnant and during termination proceeding); *In re E.G.A.*, Nos. 01-24-00204-CV, 01-24-00206-CV, 2024 WL 3941021, at *17 (Tex. App.—Houston [1st Dist.] Aug. 2024, pet. denied) (mem. op.) (after *R.R.A.*, affirming termination order based in part on evidence parent used drugs during termination proceeding).

In this case, Mother admitted to illegal drug use in December 2023. Mother tested positive for cocaine and amphetamines in April 2024, at which time she was pregnant with N.P.G. *See A.R.D.*, 694 S.W.3d at 840 (in post-*R.R.A.* case involving pattern of illegal drug use showing risk to mother's ability to parent, including drug use during pregnancy, noting that "[d]rug abuse during pregnancy constitutes conduct that endangers a child's physical and emotional well-being" (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.))). Mother tested negative for illegal substances when N.P.G. was born and at some subsequent random tests. However, when the Department caseworker observed Mother in May 2025, at a time when Mother's parental rights were in jeopardy, Mother appeared to be under the influence. *See id.* (also noting, as part of pattern

15

of illegal drug use showing risk to mother's ability to parent, evidence of mother's drug use during termination proceedings). And by the time of the June 2025 trial, Mother had missed two random tests—conduct that is treated as evidence of ongoing drug use. *See In re D.Y.V.-M.*, No. 14-24-00427-CV, 2024 WL 4984209, at *13 (Tex. App.—Houston [14th Dist.] Dec. 5, 2024, pet. denied) (mem. op.) (citing mother's failure during suit to participate in court-ordered drug testing as evidence of ongoing drug use). Indeed, a failure to complete required testing is considered to be a positive result. *See In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (father's failure to participate in court-ordered drug test was equivalent to positive test result); *In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (stating that parent's "refusal to submit to [a] drug test may be treated by the trial court as if he had tested positive for drugs").

In sum, the record shows that: (1) Mother has a criminal conviction for assault causing bodily injury; (2) Mother used illegal drugs while pregnant despite the risk of harm to N.P.G.; (3) Mother used illegal drugs again when N.P.G. was less than a year old; and (4) Mother used illegal drugs at that time despite knowing that doing so could potentially lead to the termination of her parental rights. The trial court could reasonably have interpreted the above evidence regarding the risk

16

of Mother exposing N.P.G. to drugs and violence as showing a pattern of continued substantial risk of harm to N.P.G. sufficient to support the trial court's finding of endangerment under subsection (E). *See R.R.A.*, 687 S.W.3d at 278 (holding that pattern of drug use accompanied by evidence of related dangers to child can establish substantial risk of harm sufficient to support endangerment finding).

Because we conclude the evidence is legally and factually sufficient to support the trial court's finding under subsection 161.001(b)(1)(E), we overrule Mother's first issue. We thus need not address Mother's second and third issues—i.e., that the evidence is legally and factually insufficient to support the trial court's findings under, respectively, subsections 161.001(b)(1)(N) and (O). *See A.V.*, 113 S.W.3d at 362 (stating only one predicate finding is necessary).

## D. Best Interest of N.P.G.

In Mother's fourth issue, she contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in N.P.G.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(2). There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). However, prompt and permanent placement of the child in a

safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on each factor to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001 grounds and best interest).

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and protection from repeated exposure to violence even though the violence may not be directed at the child; and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b); *R.R.*, 209 S.W.3d at 116.

### 1. Mother's History of Drug Use, Violence, and Neglect

A parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). Thus, the evidence discussed in support of the trial court's findings under section 161.001(b)(1)(E) is probative as to potential danger in

19

determining the children's best interest. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 619 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

As noted above, Mother has a criminal conviction for assault causing bodily injury. A parent's inability to maintain a lifestyle free from arrests and incarcerations is relevant to the trial court's best-interest determination. *In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *18 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.).

Mother has also struggled with illegal substance use, including drug use that contributed to findings of neglect on which basis N.P.G.'s siblings were removed from Mother's care. Mother tested positive for cocaine and amphetamines while pregnant with N.P.G. and, after N.P.G. was born, failed to comply fully with court-ordered drug testing and drug-related services during the period when Mother knew she was being evaluated for possible reunification with N.P.G. While pregnant with N.P.G., Mother was unhoused and living in an environment she described as having "drugs everywhere." The only home where Mother indicated she would be able to live with N.P.G. and someone who could serve as a safety monitor was the home of a relative whom the Department ruled out as a safety monitor due to allegations of drug use.[4] A parent's substance abuse supports a

---

[4]     Mother complains on appeal that there was no non-hearsay evidence at trial that Mother did not have a home. However, the Department caseworker testified at trial without objection that, a month prior, she had personally observed Mother at

finding that termination is in the best interest of the child. *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (noting factfinder can give "great weight" to "significant factor" of drug-related conduct); *see also In re Z.H.*, No. 14-19-00061-CV, 2019 WL 2632015, at *6 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.) (mem. op.) (considering parent's drug use in context of evaluating present and future emotional and physical danger to child). Mother's history of drug use, violence, and neglect weigh in favor of termination of Mother's parental rights to N.P.G.

### 2. N.P.G.'s Environment, Needs, and Desires

At the time of trial, N.P.G. was less than a year old and too young to express her desires. *In re A.J.H.*, No. 01-18-00673-CV, 2019 WL 190091, at *7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.) (finding that child under three was too young to express desires). When a child is too young to express her desires, the fact-finder may consider whether the child has bonded with the proposed adoptive family, is well-cared for by them, and whether she has spent minimal time with a parent. *See S.R.*, 452 S.W.3d at 369. A child's need for

---

the location where Mother was reported to be living unhoused. And the evidence that Mother's only proposal for a home where she could live with N.P.G. and a safety monitor was her relative's home was contained in an affidavit admitted at trial without objection. *See New*, 3 S.W.3d at 516 (holding that unobjected-to hearsay in affidavit is probative evidence); *J.B.*, 2024 WL 3906786, at *1 (in parental termination case, holding that appellant's failure to object to admission of affidavit at trial waived any hearsay complaint on appeal).

permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the child is relevant to the best interest determination. *In re J.E.M.M.*, 532 S.W.3d 874, 889 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

N.P.G. spent only limited time with Mother. The Department was appointed Emergency Temporary Sole Managing Conservator of N.P.G. the same day that N.P.G. was scheduled to leave the neonatal intensive care unit where she received oxygen for at least a week after she was born. And while N.P.G. has multiple siblings, Mother's parental rights have been terminated as to at least five of them.

The evidence at trial showed that N.P.G. was doing "really well" with her foster parents. The caseworker testified that N.P.G. had bonded with her foster family, who were the only family she knew, and that her foster parents had bonded with N.P.G. There was testimony that N.P.G's foster parents were a good fit for her and taking very good care of her. The evidence at trial showed that the foster parents had a three-bedroom home, and a support system that included significant assistance from the foster father's nearby father and the foster mother's sister. N.P.G. had no physical or developmental issues, and an Early Childhood Intervention assessment determined she required no services. And because

22

N.P.G.'s foster home was also a potential adoptive home, the foster parents offered permanence. These factors also weigh in favor of termination of Mother's parental rights to N.P.G.

Viewing the evidence in the light most favorable to the trial court's finding that termination of Mother's parental rights was in N.P.G.'s best interest, we conclude the trial court could have formed a firm belief or conviction that its finding was correct. *See J.F.C.*, 96 S.W.3d at 266. Further, looking at the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in N.P.G.'s best interest. *Id*.

We thus overrule Mother's fourth issue.

## Conclusion

We affirm the trial court's decree of termination.

Amparo "Amy" Guerra
Justice

Panel consists of Justices Guerra, Caughey, and Dokupil.

23